JUSTICE HARRISON
delivered the Opinion of the Court.
Appellant Gary Mannix (Mannix) appeals from a judgment entered pursuant to a special jury verdict in the Second Judicial District, Silver Bow County, and from the denial of his request for a new trial. The present case stems from the same set of facts and circumstances as our opinion in Mannix v. Butte Water Co. (1991), 249 Mont. 372, 816 P.2d 441. For clarity, we will refer to the Butte Water Company (BWC) and Dennis Washington (Washington) collectively as respondents. We affirm.
The following issues are raised on appeal:
1. Whether the District Court erred in sustaining respondents’ hearsay objections;
2. Whether the District Court abused its discretion in granting respondents’ motion for change of venue;
*83 3. Whether the District Court erred in sustaining respondents’ objection to lay witness opinion testimony;
4. Whether the District Court erred in granting respondents’ motion in limine;
5. Whether the District Court abused its discretion in not allowing Mannix’s expert witness to testify;
6. Whether the District Court erred in dismissing all claims based on breach of the implied covenant of good faith and fair dealing;
7. Whether the District Court abused its discretion in instructing the jury.
Mannix began working for BWC as a laborer in 1973. He was eventually promoted to engineer, then to superintendent, then to vice-president and operations manager and member of the board of directors. When the general manager retired in 1983, Mannix was promoted to president and general manager, the position he occupied at the time this action arose.
Before this action arose, Atlantic Richfield Company (ARCO) owned a majority of BWC’s outstanding shares. In September 1985, while negotiating a deal to buy ARCO’s mining properties in Butte, Montana, Washington learned that BWC was also for sale. Washington and ARCO eventually entered a letter agreement whereby Washington would purchase ARCO’s Butte mining properties, approximately 35,000 acres of property around Georgetown Lake, and BWC. At that time, BWC carried a $4.5 million note payable to ARCO. The agreement originally called for the full amount of the debt to be forgiven. However, from what he learned in meeting with Mannix and what he learned about the Public Service Commission’s rate making process, Dorn Parkinson, who was the president of Washington Corporations, determined that it would be beneficial for BWC to retain some debt.
Washington and ARCO agreed to modify the original agreement to retain a $2 million debt in BWC. Washington arranged a $2 million, six-month loan with a Minnesota savings and loan association where he had a substantial personal line of credit. Washington personally guaranteed payment of the loan. The $2 million from the loan was to be paid directly to ARCO for its stock in BWC, and the purchase price for the properties was to be reduced by $2 million. The result was that Washington would receive the BWC stock free of debt to ARCO, while BWC would have a six-month note payable to the savings and loan association for $2 million. ARCO did not inform Mannix of the details of this arrangement.
*84 On December 12,1985, Mannix received a call from John Thiebes, counsel for Washington Corporations. Mannix had left the office, so he returned the call the next day. Mannix claims Thiebes requested he travel to Missoula to sign some resolutions, the $2 million note, and some other papers. Mannix refused to do so because he wanted to check with ARCO’s legal counsel. He called Gene Tidball, an attorney for ARCO, who informed him that he could sign the note and other papers.
Mannix discussed the matter with Mike Patterson and Bill Mufich, members of BWC’s board of directors, and with Skip Dunfee, BWC’s secretary-comptroller. According to Mannix, they determined that it was not in BWC’s best interest to obligate it to a $2 million note, the terms and circumstances of which they knew little or nothing about. Eventually, however, Mannix, Patterson, and John O’Brien, another board member, signed a resolution authorizing board member Frank Gardner to sign the note.
Washington testified that while in Denver, Colorado, during the final negotiations, he overheard a telephone conversation between Tidball and Mannix. Washington described this as a “big argument” in which Tidball said, “This is complete insubordination. And this is grounds for termination.” Although Washington admitted that he might have fired Mannix had Mannix been as insubordinate to him as Mannix was to ARCO, Washington also made it clear that he admired Mannix for standing up to ARCO and held no prejudice against him for having done so. He felt Mannix “had a lot of guts.” Washington and ARCO closed the deal in Denver on December 18, 1985. Through Thiebes, Washington requested the resignation of all BWC board members that day. As sole shareholder, Washington elected himself, Parkinson, and Thiebes to the new board of directors. At a board meeting held the day after closing, either on the plane trip from Denver or when they landed in Missoula, the newly elected board authorized Parkinson to meet with Mannix to determine whether he should remain as president of BWC. Parkinson testified that the new board wanted him to meet with Mannix because the events surrounding the closing of the deal and Mannix’s unfavorable reaction to the deal “basically raised a flag in our mind as to — is there some kind of fundamental problem here.... ” Parkinson testified that he had any option available in dealing with Mannix’s employment after that meeting.
Parkinson went to Butte the next day, December 20, and met with Mannix. The parties dispute what happened at that meeting. Park *85 inson testified that Mannix described the manner in which the sale was transacted as immoral and unethical and that Mannix characterized Washington as immoral; that Mannix said he would do the same thing again (apparently referring to his refusal to sign the note); that Mannix said he would always do what he thought was in BWC’s best interest; and that Mannix did not offer to put the past behind them and get on to the future. Mannix testified that although he felt the events surrounding the sale had created a severe problem, he said to Parkinson that he thought their only option was “to roll up our sleeves and go on from here.” Mannix testified that he did not tell Parkinson that he could not go on as president of BWC; that he did not say anything to Parkinson that would lead Parkinson to believe that he did not want to continue as president; and that he did not resign or express any reluctance to continue as president.
Parkinson fired Mannix as a result of that meeting. Mannix maintains that he was fired in retaliation for his refusal to sign the $2 million note and that the decision to fire him actually was made at the board meeting held on December 19.
Mannix told his fellow employees and the press that he had been fired because of a “fundamental difference in business philosophy.” Both men agree that Parkinson suggested this phrase as an explanation. On his “CLAIMANT’S DISCHARGE STATEMENT” filed in pursuit of unemployment compensation benefits, Mannix stated under oath that this was the reason for his termination. When asked if the reason was true, he checked the box marked ‘YES.” Both Mannix and his wife admitted during trial that Mannix and the new board had a difference in business philosophy.
Mannix originally filed suit against ARCO, The Anaconda Minerals Company, BWC, Washington Corporations, and Dennis Washington. The complaint sought damages for wrongful termination, breach of the implied covenant of good faith and fair dealing, and punitive damages. ARCO, Anaconda Minerals, and Washington Corporations were later dismissed. In February 1991, the District Court granted partial summary judgment in favor of Washington on all claims except one based on a theory of piercing the corporate veil. Mannix appealed and we affirmed. Mannix v. Butte Water Co. (1991), 249 Mont. 372, 816 P.2d 441.
In August 1991, the District Court granted the respondents’ motion for change of venue, moving the trial from Silver Bow to Flathead County. The case was then tried before a jury. At the close of Mannix’s case in chief, the District Court granted a directed verdict in favor of respondents on the claims of breach of the implied covenant of good *86 faith and fair dealing, wrongful discharge, and punitive damages. The jury subsequently returned a special verdict in favor of respondents finding that the board of directors had a basis to conclude that it was no longer in BWC’s best interest to retain Mannix as president. Mannix appeals from the judgment entered on that verdict and from the denial of his motion for a new trial.
I
Did the District Court err in sustaining the respondents’ hearsay objections?
Mannix claims the District Court erred in refusing to allow him to relay the contents of conversations he had with LeRoy Wilkes, an ARCO employee, and with Ron Woods, a rate analyst for the Public Service Commission. Respondents’ counsel objected on the grounds that the testimony contained impermissible hearsay. Mannix argues on appeal that the only purpose for the testimony was to show that he had no information concerning the $2 million note and that other people agreed that under the circumstances the note should not be signed. Mannix argues that the testimony helped explain his actions and describe his state of mind, and therefore was permissible under this Court’s holding in Moats Trucking Co., Inc. v. Gallatin Dairies, Inc. (1988), 231 Mont. 474, 753 P.2d 883.
Rule 801(c), M.R.Evid., defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Under Rule 802, M.R.Evid., “Hearsay is not admissible except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state.”
In Moats, the defendant wanted to introduce testimony of a conversation between its general manager and one of its employees. We held that because the testimony was not offered to prove the truth of the matter asserted, but for the purpose of showing that the statement was made and the resulting effect on the general manager’s state of mind, it was permissible. Moats, 753 P.2d at 886. The present case is distinguishable from Moats. In his brief, Mannix’s own argument indicates that the testimony was in fact offered for its truth. He argues that the purpose of the testimony was to “show that ARCO personnel would not provide information on the note and that those surrounding Mannix agreed with his conclusion that signing the note was imprudent.”
*87 Unlike the testimony in Moats, the testimony here was offered to prove: 1) ARCO personnel would not provide information; and 2) those surrounding Mannix agreed with him. Furthermore, the evidence Mannix sought to present was admitted through other testimony. The transcript is replete with testimony that ARCO had not provided Mannix any information on the note and that Ron Woods, Mike Patterson, Bill Mufich, and John O’Brien agreed that the note should not be signed. We have previously held that where no prejudice arises and the substantial rights of a party are not adversely affected because the evidence sought to be introduced is admitted through other testimony, no reversible error occurs. See Niemen v. Howell (1988), 234 Mont. 471, 764 P.2d 854. We conclude that the District Court did not err in excluding the proffered testimony.
II
Did the District Court abuse its discretion in granting respondents’ motion for change of venue?
On January 25, 1991, respondents filed a motion for change of venue based on their belief that an impartial trial could not be held in Silver Bow County and that the ends of justice would be promoted by a change of venue. Respondents requested that the motion “be a continuing motion up until the time of trial as the elements which [gave] these Defendants reason to believe that an impartial trial [could] not be had in the present venue, [were] continuing in nature and these elements exist[ed] as a result of the cumulative impact of a series of events and media attention associated therewith.” After briefing and oral argument by both parties, Judge Purcell, who was then presiding over this case, granted the motion.
In support of their claim that they could not get a fair trial in Silver Bow County, the respondents specifically cited the following: 1) the residents of Silver Bow County had a potential interest in the outcome of this case, and as ratepayers of BWC they were potentially plaintiffs in a class-action suit pending in Silver Bow County in which BWC and Washington were named defendants; 2) hostile public opinion had been aroused in Silver Bow County due to extensive media reports and editorials so that prejudice existed in the minds of potential jurors; 3) Judge Sullivan, who was presiding over the case when the motion was filed, had been the subject of articles and editorials in The Montana Standard suggesting that he exercised favoritism; 4) counsel for the plaintiffs in the class-action suit had *88 been widely quoted in The Montana Standard as saying that BWC was the “alter ego” of Washington and that Washington could be held personally liable for its actions.
The respondents provided an extensive accumulation of newspaper articles and editorials in support of their motion. They cited an article dated January 15, 1991, entitled ‘Washington ‘pocketed’ $1 million, Goetz says,” and an editorial criticizing Judge Sullivan’s support of legislation regarding non-disclosure of judiciary disciplinary actions. That article mentioned Judge Sullivan’s removal from a case involving Washington because it was alleged by one of the parties in that case that Judge Sullivan’s personal and family relationship with Washington was too close.
In granting the respondents’ motion, Judge Purcell stated: Because of what has transpired in this thing over the last — over a long period of time, ... there are pros and cons both ways in this thing, as to whether Mr. Mannix has a lawsuit. There is that rumor on the street. I can say that. A lot of people say that he does not have a case here. And a lot of people say that he is entitled to get all kinds of remuneration. So the Court is taking — I have studied this thing, basically, since the Motions were before me, and I am going to grant the Motion for a Change of Venue in this case.
And I think that it is in the best interest of all the parties. I want both parties here to get as fair a trial as possible. There was an article that appeared in the Montana Standard around the 4th of July here, that came out of nowhere. I mean, there was nothing going on, in my opinion that — That it was not fair, as far as I can see, to either side.
Section 25-2-201, MCA, the statute governing change of venue provides in pertinent part:
When change of venue required. The court or judge must, on motion, change the place of trial in the following cases:
(2) when there is reason to believe that an impartial trial cannot be had therein;
(3) when the convenience of witnesses and the ends of justice would be promoted by the change.
A movant is entitled to a change of venue upon a showing that there are reasonable grounds to believe that prejudice actually exists which creates a reasonable apprehension that a fair and impartial *89 trial cannot be held in the current venue. State v. Pease (1987), 227 Mont. 424, 432, 740 P.2d 659, 664; relying on State v. Holmes (1983), 207 Mont. 176, 181, 674 P.2d 1071, 1073. Absent an abuse of discretion, the district court’s ruling on a motion for change of venue will not be disturbed. When pre-trial publicity is the grounds upon which prejudice is based, the publicity “must be inflammatory and create a reasonable apprehension that a fair trial ...” cannot be had in the current venue. Pease, 740 P.2d at 664 (quoting Holmes).
Mannix argues that the respondents’ reliance on the fact that the potential jurors might be members of a class action suit in which the respondents were the defendants, and on the fact that the jurors, as ratepayers, had an interest in the case, is misplaced. Mannix cites School District No. 1 v. Globe and Republic Ins. Co. (1963), 142 Mont. 220, 383 P.2d 482 (any interest potential jurors had as taxpayers was not sufficient to justify change of venue); and Carter County v. Cambrian Corp. (1963), 143 Mont. 193, 387 P.2d 904 (jurors not disqualified where statute specifically provided that jurors were not disqualified for being taxpayers of a county that is party to the suit), to support his argument. However, this was not the only basis on which respondents relied or on which the District Court granted the motion.
Mannix also argues that under the twenty-day requirement of Rule 12(b)(iii), M.R.Civ.P., the respondents were only entitled to rely on the two newspaper articles cited above as they were the only “events” that occurred within twenty days of filing of the motion. He argues that any prejudice created based on these two articles alone does not rise to the level required to grant a change of venue.
Rule 12(b)(iii), M.R.Civ.P., sets forth the time limitations for bringing a motion for change of venue under subsections (2) and (3) of § 25-2-201, MCA.
(iii) Any request for change in place of trial for grounds 2 and 3 of section 25-2-201, Montana Code Annotated, must be presented by motion within 20 days after the answer to the complaint, or to the cross-claim where a cross-claim is filed, or the reply to any answer, in those cases in which a reply is authorized, has been filed; except that whenever at some time more than 20 days after the last pleading has been filed an event occurs which thereafter affords good cause to believe that an impartial trial cannot be had under ground 2 of said section 25-2-201, and competent proof is submitted to the court that such cause of impartiality did not exist within the 20-day period after the last pleading was filed, then the *90 court may entertain a motion to change the place of trial under ground 2 of section 25-2-201 within 20 days after that later event occurs.
The respondents’motion was a continuing one to cover future articles and editorials regarding the respondents. Judge Purcell even noted the publicity as late as July 1991. The “event” was a barrage of articles and editorials regarding BWC and Washington. In such a situation, strict application of the twenty-day rule is impractical. This Court previously has considered a series of newspaper articles that occurred over more than a twenty-day period. In Pease, we considered a series of nineteen newspaper articles that had been published over the course of the defendant’s case. Rule 12(b)(iii) contained the same twenty-day limitation then as it does now. In Pease, however, we specifically noted that the articles were news articles and not editorials. Here, the articles included numerous editorials concerning the respondents.
As noted above, Judge Purcell expressed valid concerns about each party’s ability to receive a fair trial in Silver Bow County. We conclude that he did not abuse his discretion in granting respondents’ motion for change of venue.
Ill
Did the District Court err in sustaining respondents’ objection to lay witness opinion testimony?
During his case in chief, Mannix called Bill Mufich, a board member at the time BWC was sold to Washington. The following exchange took place.
Q. And did you think that it was in the best interest of the Butte Water Company to terminate Gary Mannix?
MR. MACDONALD [respondents’ counsel]: To which I will object, Your Honor. This invades the province of the jury.
THE COURT: Sustained.
Q. Do you have an opinion, based upon your experience as a director, as to whether or not, it was in the best interest of the Butte Water Company to retain Gary Mannix as its president?
MR. MACDONALD: Same objection. It calls for —
THE COURT: He is only asking him, does he have an opinion. Proceed.
Q. You may answer.
A. Yes.
*91 Q. And what is that opinion?
MR. MACDONALD: Same objection.
The court sustained the objection. Mannix argues on appeal that “Mufich’s long relationship with ARCO and the Butte Water Company provided a basis for him to testify on his perceptions concerning the corporation’s best interests.” Mannix was seeking lay witness opinion testimony from Mufich. Under Rule 701, M.R.Evid., the testimony must have been rationally based on Mufich’s perceptions and helpful to a clear understanding of his testimony or the determination of a fact in issue. Mannix does not argue that the opinion testimony was offered because it helped the jury understand Mufich’s testimony; therefore, in order to be admissible it must have been helpful in determining a fact in issue. We hold that Mufich’s proffered testimony failed the second part of this test.
The special verdict form given to the jury was based on § 35-1-411, MCA (1985). That statute read:
Removal of officers. Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights. [Emphasis added.]
On its face the statute is clear that the determination to terminate an officer is a subjective one for the board of directors to make.
The special verdict form asked the following question:
Did the Board of Directors of The Butte Water Company in their judgment have a basis to conclude on December 23, 1985, that it was no longer in the best interests of The Butte Water Company, as is defined in these instructions, to retain the Plaintiff as its President? [Emphasis added.]
The question here was not whether in Mufich’s opinion it was in the best interests of the corporation. As he was not a member of the board that made the decision, his opinion was irrelevant and inadmissible; it did not go to the determination of a fact in issue. Although the District Court excluded this testimony on the grounds that it invaded the province of the jury, because we conclude under Rule 701, M.R.Evid., that its ultimate determination to exclude the evidence was correct, it will be upheld. See District No. 55 v. Musselshell County (1990), 245 Mont. 525, 802 P.2d 1252; Jerome v. Pardis (1989), 240 Mont. 187, 783 P.2d 919.
*92 IV
Did the District Court err in the manner in which it applied its order granting respondents’ motion in limine?
On September 20, 1991, the District Court granted respondents’ motion in limine which sought to exclude evidence regarding the authority of the newly elected board of directors to act. In its memorandum, the court stated that “[t]he motion is granted as stated but it shall be narrowly construed to exclude evidence regarding the legal authority of the board to act but not evidence regarding the nature and character of those actions and their propriety.” During trial, Mannix’s counsel conceded the legality of the board’s meetings. However, Mannix claims that the District Court erred in the manner in which it applied this order. Mannix claims that the District Court committed prejudicial error by preventing him from introducing evidence of the following: 1) the newly elected board did not include anyone from BWC in its meeting; 2) the board did not include Skip Dunfee, BWC’s secretary, in its meetings; 3) the board did not seek opinions from BWC personnel before it decided to terminate Mannix.
Our reading of the record, however, reveals that Mannix was allowed to introduce the evidence he claims was excluded. The record reveals the following testimony was given by Skip Dunfee on direct examination:
Q. And what was your position in December 1985, sir?
A. I was comptroller/secretary.
Q. And what are the differences in job responsibilities between those that you had in December 1985 and now?
A. As a secretary, I was in charge of the minutes of the quarterly meetings; of the annual meeting. I am responsible for keeping track of those records. I had the seal of the Butte Water Company which was used on all legal documents et cetera....
Q. And that would have been prior to the time, then, that Washington became the owner of the Butte Water Company, on December 18, 1985.
A. That is correct.
Q. Mr. Dunfee, there has been received here in evidence an exhibit that has been marked as Plaintiff’s Exhibit No. 3. The exhibit contains the minutes of two Board meetings with the Butte Water Company. One is dated December 19, 1985; and the other is dated *93 December 23, 1985.1 will just ask you to examine the exhibit and I will give you a few minutes to do so, because you may not have seen it before.
A. Okay.
Q. Have you had a chance to look at the minutes of both meetings? A. Yes, I have.
Q. Did you receive notice of either of those two meetings?
A. No, sir.
Q. Did you attend either of those two meetings of the Butte Water Company?
A. No, sir.
Q. What was your position with the company at the time of the meetings?
A. Comptroller/secretary.
Q. Okay. When did you become comptroller/secretary for the Butte Water Company?
A. In the latter part of 1967.
Q. What are the duties — Strike that. Are there by-laws of the Butte Water Company that regulate or describe, rather, the duties of the secretary/comptroller?
A. Yes.
Q. Can you describe for the jury what it was that a comptroller/secretary was called upon to do for the company.
A. As I mentioned earlier, the secretary kept the minutes of all the quarterly meetings.
Q. In Plaintiff’s Exhibit No. 3, which purports to be minutes of a special meeting of the Board of Directors of the Butte Water Company, and it was shown as the secretary by John Thiebes. The first meeting on December 19, 1985, shows Mr. Thiebes signing that as secretary. What was your position on December 19, 1985? A. I thought that I was secretary.
Q. Were there two secretaries?
A. There could have been.
Q. Mr. Dunfee, you were referring to Plaintiff’s Exhibit 3 which referenced a Board meeting on December 19, 1985, and a Board meeting on December 23, 1985.
*94 A. Okay.
Q. I will ask you if you received notice of either of those meetings? A. No, sir, I did not.
Q. Did you attend either of those meetings, Mr. Dunfee?
A. No, sir.
Q. And during the time that Gary Mannix was the president of the Butte Water Company, did you attend all the Board of Directors’ meetings?
A. To my knowledge, I would say 95 percent of them.
Q. And at the time that we are talking about, who were the members of the Board of Directors for the Butte Water Company? A. Mr. Mannix, Mr. Patterson, Mr. Gardner, Mr. O’Brien and Mr. Mufich.
Q. So in this discussion, there was Mike Patterson, who was a member of the Board of Directors, right?
A. Yes.
Q. Mr. Mannix, who was chairman of the Board of Directors.
A. Yes.
Q. And, yourself, who attended the Board meetings and took the minutes as the secretary of the company.
A. That is correct.
Q. ... After Washington became owner on December 18, 1985, did you — were you ever noticed of anymore Board meetings during your tenure with the Butte Water Company?
MR. MACDONALD: To which we will object, Your Honor. That is irrelevant.
THE COURT: He may answer.
Q. Go ahead.
A. No, sir.
During cross-examination of Dorn Parkinson, Mannix’s counsel elicited the following testimony:
Q. All right. In making this decision, to terminate Mr. Mannix, did you contact Bill Mufich who had served as a Board member of the Butte Water Co. immediately prior to your acquisition and ask Mr. Mufich whether Mr. Mannix had ever “bucked” policy of the Board of Directors?
*95 A. No I did not.
Q. Did you ever contact Mr. Patterson, a Board member, to ask him whether or not Mr. Mannix had ever “bucked” policy of the Board of Directors?
A. No, I did not.
Q. Did you make any attempt to contact Mr. Dunfee, the secretary who took all the minutes at Board of Directors’ meetings, to determine if Mr. Mannix had ever gone against the wishes of the Board of Directors of the Water Co.?
A. No, I did not.
Q. Did you make any attempt, whatever, to ascertain what kind of a record Mr. Mannix had had in the past with the Water Co., with respect to his relationship with the Board of Directors?
A. I instigated no investigation.
Q. To your knowledge, did Mr. Washington instigate any investigation?
A. Did not, to my knowledge.
Q. To your knowledge, did Mr. Thiebes initiate any investigation?
A. Did not.
Because Mannix was allowed to present the testimony he claimed was excluded, we conclude the District Court did not err in the manner in which it applied its order.
V
Did the District Court abuse its discretion in refusing to allow Mannix’s expert witness to testify?
Mannix retained Alan Brown to testify about proper employment and termination practices in effect at the time he was terminated and how the covenant of good faith and fair dealing applied in those situations. Mr. Brown had worked as a labor relations manager and personnel representative from 1967 to 1984 with the Anaconda Company and Champion International. Since 1984 he had worked as a labor relations consultant. The respondents moved to exclude Mr. Brown’s testimony on the ground that he was not qualified to testify regarding the relationship between corporate officers and boards of directors or the termination of a corporate officer. The District Court granted the motion based on what it learned from Mr. Brown’s deposition. In his deposition, Mr. Brown admitted: 1) he had never been involved in the termination of a corporate president or other officer; 2) he had never been involved in the termination of a board *96 member; 3) he had never attended any special seminars directed toward termination policies regarding officers or directors; 4) he did not consider himself an expert on corporate law; 5) he had never been involved in a case involving the termination of an officer or director; and 6) he did not hold himself out as an expert on the relationship between officers and directors or the interpretation of by-laws regarding that relationship.
A witness qualified as an expert may testify where specialized knowledge will assist the trier of fact to understand the evidence or determine a fact. Rule 702, M.R.Evid. The existence and breach of the covenant of good faith and fair dealing is a proper subject for expert testimony. See Niles v. Big Sky Eyewear (1989), 236 Mont. 455, 771 P.2d 114; Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487. “Questions of the admissibility of evidence are left largely to the discretion of the trial court, which will be overturned only in cases of manifest abuse of that discretion.” Zugg v. Ramage (1989), 239 Mont. 292, 296, 779 P.2d 913, 916. The district court’s determination on the qualification and competency of an expert witness to testify will only be disturbed when there is a showing that the district court abused its discretion. Foreman v. Minnie (1984), 211 Mont. 441, 445, 689 P.2d 1210, 1212; Zugg, 779 P.2d at 917.
In the present case, the jury may have needed assistance in understanding the relationship between the officers and directors of a corporation and the interplay of the covenant of good faith and fair dealing in that relationship. However, the District Court determined that Mr. Brown, by his own admissions, was not qualified to testify on this matter. We conclude that the District Court did not abuse its discretion by excluding Mr. Brown’s testimony.
VI
Did the District Court err in dismissing all claims based on breach of the implied covenant of good faith and fair dealing?
At the close of Mannix’s case in chief, the District Court granted a directed verdict in favor of respondents on all claims based on breach of the implied covenant of good faith and fair dealing. Mannix claims that he was forced to go along with this ruling because, as a result of the exclusion of Alan Brown’s testimony, he had not been able to present evidence on the existence of the covenant. As discussed above, the District Court properly excluded Mr. Brown’s testimony.
*97 In determining whether the District Court properly withdrew the issue from the jury, we look to “whether reasonable men could draw different conclusions from the evidence. If only one conclusion is reasonably proper, then the directed verdict is proper.” Semenza v. Leitzke (1988), 232 Mont. 15, 18, 754 P.2d 509, 511 (citation omitted).
It is Mannix’s position that the controlling law on the termination of a corporate officer was the “Best Interest Test” found in § 35-1-411, MCA (1985), as supplemented by our decisions in Gates v. Life of Montana Ins. Co. (1982), 196 Mont. 178, 638 P.2d 1063 (Gates I), and progeny. Section 35-1-411, MCA (1985), stated:
Removal of officers. Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.
In Gates I we held that the covenant of good faith and fair dealing was implied in the employment contract of the plaintiff/ employee. 638 P.2d at 1067. In Gates v. Life of Montana Ins. Co. (1983), 205 Mont. 304, 307, 668 P.2d 213, 214-215 (Gates II), we stated that the duty created by the covenant arises out of the employment relationship and is imposed by operation of law. For purposes of our discussion here we will assume, without deciding, that the covenant supplements the statute.
However, whether the covenant “is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee’s reasonable belief that he or she has job security and will be treated fairly.” Dare v. Montana Petroleum Mktg. Co. (1984), 212 Mont. 274, 282, 687 P.2d 1015, 1020. The objective manifestations must come from the employer. Karell v. American Cancer Society (1989), 239 Mont. 168, 175, 779 P.2d 506, 510. We went on in Karell to expound on the importance of the employer’s role in determining whether the covenant was implied.
The employer’s position is pivotal in the employment relationship. The employer has the exclusive right to hire and fire. The employer is responsible for the employee’s performance and is in the best position to evaluate it. The employer has the power to rebuke or reward the employee and is the only one with the power to create job security.
Karell, 779 P.2d at 510.
*98 Mannix argues that his twelve years of service, his raises, and the praise he received from peers and supervisors gave rise to the covenant. However, Mannix admitted that he realized he served at the discretion of the board of directors and was aware of that when he became president.
Because Mannix presented no evidence of objective manifestations, the District Court properly granted the directed verdict.
VII
Did the District Court err in instructing the jury?
Lastly, Mannix argues that the District Court erred in instructing the jury. The District Cotub has discretion in deciding how to instruct the jury, taking into account the theories of contending parties, and we will not overturn that decision except for abuse of discretion. Cline v. Durden (1990), 246 Mont. 154, 164, 803 P.2d 1077, 1083. “[I]nstructions must be considered in their entirety, and to determine whether instructions were properly given or refused this Court will read them in connection with other instructions given and consider them in the light of the evidence introduced.” Brown v. North Am. Mfg. Co. (1978), 176 Mont. 98, 114, 576 P.2d 711, 721 (citation omitted).
Mannix offered instructions based on both the “best interest” statute and this Court’s decision in Buck v. Billings Montana Chevrolet, Inc. (1991), 248 Mont. 276, 811 P.2d 537. Instructions numbered 13 and 15A, which were given by the court read:
INSTRUCTION NO. 13. The law of the State of Montana, pursuant to Montana Code Annotated Section 35-1-411, is that any officer may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby.
INSTRUCTION NO. 15A. You are instructed that a legitimate business reason is a reason that is neither false, whimsical, arbitrary or capricious, and it has some logical relationship to the needs of the business. In applying this definition, one must take into account the right of an employer to exercise discretion over who it will employ and keep in employment.
Instruction 15A comes from Buck where this Court defined the term “legitimate business reason” in the context of the Wrongful Discharge from Employment Act, § 39-2-901 et seq.
Mannix’s proposed instruction number 22, which was refused, read:
*99 A determination made by the board of directors to terminate a corporate officer must be rationally related to a legitimate business interest.
Mannix argues that these instructions, when taken together, helped define and limit the scope of the directors’ judgement. The refused instruction served to link the best interest instruction (#13) to the instruction defining legitimate business interest (#15A). Without it, Mannix argues, instruction #15Amade no sense.
However, the court also gave the following instructions: INSTRUCTION NO. 15: The employer is entitled to serve its own legitimate business interests; an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world and the employer needs flexibility in the face of changing circumstances.
INSTRUCTION NO. 22: If you find that the Plaintiff’s discharge was not, in the judgment of the Board of Directors, in the best interest of the Butte Water Company as defined by these instructions, then you must also determine whether the Defendant’s actions proximately caused any loss incurred by Plaintiff. [Emphasis added.]
The special verdict form also included the phrase “in the best interest of the Butte Water Company as defined in these instructions.” We note that Instruction 15Awas the only instruction containing a definition. Also, Mannix’s counsel argued to the jury during closing that it was “to determine whether or not the reasons that they [the board of directors] pursued were false, whimsical, arbitrary or capricious. And whether they had a logical relationship to the needs of this business.”
When read as a whole, the instructions sufficiently instructed the jury as to the scope of the board’s judgment. Therefore, the District Court did not abuse its discretion.
Affirmed.
CHIEF JUSTICE TURNAGE, JUSTICES GRAY, McDONOUGH and WEBER concur.